UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


GREGORY EDWARDS,

               Plaintiff,                                   Civil Action No.
                                                          09-CV-13829

vs.

                                                   PAUL D. BORMAN
METROPOLITAN LIFE INSURANCE           UNITED STATES DISTRICT JUDGE
COMPANY,

               Defendant.
_____/


## OPINION AND ORDER
## (1) GRANTING DEFENDANT'S MOTION TO AFFIRM THE PLAN ADMINISTRATOR'S DECISION DENYING PLAINTIFF'S CLAIM FOR LONG-TERM DISABILITY BENEFITS,
## (2) DENYING PLAINTIFF'S MOTION TO REVERSE THE PLAN ADMINISTRATOR'S DECISION DENYING PLAINTIFF'S CLAIM FOR LONG-TERM DISABILITY BENEFITS, and
## (3) ENTERING JUDGMENT IN FAVOR OF DEFENDANT

## I. INTRODUCTION

This case is brought under the Employee Retirement Income Security Act (ERISA). Plaintiff

Gregory Edwards, a former employee of GMAC Insurance (GMAC), claims that Defendant

Metropolitan Life Insurance Company (MetLife) wrongfully denied his claim for long-term

disability (LTD) benefits under the GMAC Insurance Personal Lines Group Long-Term Disability

Plan, an employee welfare benefit plan governed by ERISA. MetLife denied Plaintiff's claim

because it determined that the medical documentation before it did not contain objective medical

evidence of functional limitations which would preclude Plaintiff from performing his job duties.

Plaintiff argues that he has provided MetLife with sufficient objective proof of continuing disability

and that MetLife's denial of his claim was arbitrary and capricious.

This matter is before the Court on: (1) Plaintiff's Motion to Reverse Defendant's Arbitrary and Capricious ERISA Determination and Grant Long-Term Disability Benefits" and (2) MetLife's "Motion to Affirm Administrator's Decision" denying Plaintiff's claim for LTD benefits. Both parties have submitted response briefs, but no reply briefs have been filed.[1] Oral argument was heard on August 26, 2010. For the reasons that follow, MetLife's motion will be granted; Plaintiff's motion will be denied.

## II. Legal Standard Governing ERISA Actions for Benefits

This case is brought pursuant to 29 U.S.C. § 1132(a)(1)(B), which empowers individuals to bring a civil action "to recover benefits due to him under the terms of his plan." The Court decides this matter pursuant to the guidelines set forth by the Sixth Circuit in *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609 (6th Cir. 1998). There, the Sixth Circuit determined that summary judgment procedures are inapplicable to the adjudication of ERISA actions for employee benefits and that, instead, district courts should render findings of fact and conclusions of law based solely upon the evidentiary materials contained in the administrative record. *Id.* at 619 (Gilman, J., concurring).

## III. ANALYSIS

### A. Findings of Fact[2]

### A.

Plaintiff worked for GMAC as a Senior Claims Injury Representative beginning on July 1,

---

[1] In their jointly submitted discovery plan, the parties "agree that no Reply Briefs are to be filed." *See* docket entry 12, p. 3.

[2] The findings of fact are gleaned from the administrative record.

2000. Plaintiff last worked for GMAC on August 30, 2007, at which time Plaintiff was 44-years-old. Admin. R. (AR) 224. Plaintiff's job was sedentary. Plaintiff's job duties and responsibilities are listed at AR 216-218.

**B.**

Plaintiff is a plan participant of the GMAC Insurance Personal Lines Group Long-Term Disability Plan ("the plan"). The complete terms of the plan are found at AR 1-44. LTD benefits are payable to the plan participant if the plan administrator determines that the participant (1) is "Disabled" and (2) "became Disabled while covered under the Plan." AR 19. "Disabled" is defined in the plan as follows:

> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis . . . and
>
> 1. during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy, or
>
> 2. after the 24 month period, you are unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.
>
> Your loss of earnings must be a direct result of your sickness, pregnancy or accidental injury. Economic factors such as, but not limited to, recession, job obsolescence, payouts and jobsharing will not be considered in determining whether you meet the loss of earnings test.

AR 20. The "Elimination Period" is defined as "180 days of continuous Disability." AR 14.

If the plan participant is entitled to LTD benefits, he or she will be paid as follows:

> Benefits will begin to accrue on the date following the day you complete your Elimination Period. Payment of the Monthly Benefit will start on the

> date one month after completion of the Elimination Period. Subsequent payments will be made each month thereafter. Payment is based on the number of days you are Disabled during each one month period.

AR. 19. Plaintiff's purported disability commenced on August 31, 2007. AR 224. This is the date triggering the commencement of the Elimination Period. Thus, under the terms of the plan, Plaintiff's LTD benefits would have begun accruing, had the plan administrator determined that he met the requirements for LTD benefits, on February 28, 2008, which is "the date following the day" Plaintiff completes his Elimination Period (i.e., day 181).

Notably, the plan terms give the plan administrator and plan fiduciaries "discretionary authority" to interpret the terms of the plan and determine eligibility:

> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

AR 42-43. This language is important because it triggers a highly deferential standard of review. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) ("a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan"). *Bruch* was recently reaffirmed by the Supreme Court in *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, --- (2008). Both parties agree that the arbitrary and capricious standard applies in this case.[3]

_____

[3] Defendant MetLife is a plan fiduciary and, as such, "ha[s] the authority to control and manage the operation and administration of the Plan." AR 45. Thus, MetLife both decides whether a participant is eligible for LTD benefits and pays those benefits. As will be discussed

In addition, the plan requires the participant to provide proof of disability at his or her own expense:

> In order to receive benefits under This Plan, you must provide to us at your expense, and subject to our satisfaction, all of he following documents . . .
>
> ✓   Proof of Disability.
>
> ✓   Evidence of continuing Disability.
>
> ✓   Proof that you are under the Appropriate Care and Treatment of a Doctor throughout your Disability.
>
> ✓   Information about Other Income Benefits.
>
> ✓   Any other material information related to your Disability which may be requested by us.

AR 15-16.

## C.

Plaintiff's medical problems began in 2007, when he was diagnosed with hemorrhoids and an anal fissure. AR 250-251. On August 31, 2007, Dr. Jordy Sacksner performed a hemorrhoidectomy and sphincterotomy. Plaintiff, at the time, was complaining of rectal bleeding and anal pain, and described the pain "as a sharp knife stabbing pain." AR 250. Dr. Sacksner's notes from this procedure are found at AR 250-251.

Plaintiff was on leave under the Family Medical Leave Act from August 31, 2007, until March 28, 2008. AR. 231-245.

On December 12, 2007, Dr. Sacksner wrote that Plaintiff may return to work with no restrictions on February 15, 2008. AR 230.

---

later, this dual role gives rise to the potential for a conflict of interest.

On February 15, 2008, Dr. Neil Gilbert of Gilbert Neurological Associates, PLLC, wrote that Plaintiffs needs two weeks off work due to back pain.  AR 227.

About two weeks later, on February 29, 2008, Dr. Gilbert wrote that Plaintiff needs six weeks off work for management of his back pain and radiculopathy.  AR 226.

Following the August 31, 2007, surgery by Dr. Sacksner, Plaintiff complained of "sharp and dull pain within the rectal region," especially when sitting, and numbness of the buttocks.  AR 253. Plaintiff was examined by Dr. Harry Wasvary of Oakland Colon and Rectal Associates, P.C., on April 3, 2008, who found "a moderate degree of stenosis within the anus" and "tenderness in the anterior region." *Id*.  Dr. Wasvary treated with dietary modifications and ointment, and noted that if Plaintiff's condition did not improve within six week, an exam under anesthesia may be appropriate. *Id*.

On April 9, 2008, Plaintiff treated with Dr. Wasvary and reported that "numbness in buttocks" and "urgency of [bowl movements] but [no] accidents."  AR 165.

On April 23, 2008, Plaintiff treated with Physical Therapist Alissa Klein-Krause, Beaumont Hospital Outpatient Physical Therapy.  AR 178-179.  In sum, the Physical Therapist's notes reflect: (1) a functional ability of 23%; (2) pain of 7 out of 10 on the McGill pain scale; (3) range of motion deficits; (4) strength deficits; (5) soft tissue mobility is decreased; (6) gait deficits; (7) balance deficits; (8) neurological deficits; and (9) a prognosis of "good."  The report, which was prepared by the Physical Therapist and reviewed by Dr. Gilbert on May 12, 2008, also lists short-term and long-term goals.

On May 22, 2008, the Physical Therapist wrote that Plaintiff

> will be performing pool therapy/exercises until his surgery date of June 9th, 2009.  Upon release from his surgeon he will resume physical therapy per his

neurologist Dr. Gilbert.  Land and pool exercises are to be performed 3-4
times per week.

AR 180.

On May 22, 2008, Dr. Wasvary wrote that Plaintiff is scheduled for surgery on June 9, 2008,

that the expected recovery time is one week, and that "he should be able to return to work on

6/17/08."  AR 181.

On June 9, 2008, Plaintiff underwent an examination under anesthesia, performed by Dr.

Wasvary, due to complaints of constant pain in the perirectal area.  AR 163, 169.  Following the

procedure, Dr. Wasvary noted that everything was "completely normal":

> Upon visual inspection with the aid of the retractor, there was no evidence
> of a thrombosed hemorrhoid, and there was really no evidence of any
> significant hemorrhoids.  There was no evidence of an anal fissure.  There
> was no evidence of any infectious process and there was no evidence of an
> abscess.  Given that this examination was completely normal, and I saw no
> obvious etiology to his pain, I chose not to proceed any further.

AR 169.

Plaintiff was evaluated by Dr. Justin Riutta, LMR Rehabilitation Associates, P.C., on June

20, 2008, after his June 9, 2008, surgery by Dr. Wasvary.  Dr. Riutta's notes recite Plaintiff's

medical history:

> **HISTORY OF PRESENT ILLNESS**: Mr. Edwards is a 45-year-old male
> who comes today upon referral by Dr. Kakish for evaluation of the above
> mentioned complaints.  He identifies his recent medical history began on
> 8/31/2007 when, because of inability to evacuate his bowels, he underwent
> a partial lateral sphincteractomy by Dr. Sacksner.  He states post-operatively,
> he had continued pain in the buttock area which limited his capacity to sit
> and change his movement patterns.  He has, thereafter, developed numbness
> and burning in both but [sic] cheeks and into the right posterior portion of the
> thigh.  This started in the fall.  He states the symptoms are generally worse
> with sitting.  He was eventually referred to Dr. Neil Gilbert who is a
> neurologist who performed an MRI of the lumbar spine which revealed a
> noncompressive disc at the L5-S1 level with associated degeneration.  He

states that he was placed in physical therapy and had some exercises performed but identifies that he still has persistent symptomatology. He identifies low back pain that is worse when he changes position and worse with sitting protracted period of time. He identifies knee pain with prolonged sitting. He has pain in the balls of the feet. He has aching in the shoulder and in the shoulder girdle. He identifies he has previously been on Motrin which helps but he was taken off this one month ago by Dr. Gilbert. He identifies that he is not having any neurogenic changes below the knees nor in the upper extremities. No headaches or vision changes. There are no other active issues.

AR 187. A physical examination performed by Dr. Riutta on June 20, 2008, revealed, in pertinent part, the following results:

The shoulder examination reveals a high riding shoulder on the right with abnormal scapulohurneral mechanics with no weakness to resisted abduction or external rotation. Left shoulder was stable with full pain-free range of motion. No weakness to resisted abduction or external rotation. Elbow and hand were stable with no crepitus, no effusion, and no ligamentous laxity. Ankle reveals a stable ankle mortise. He had tenderness over the plantar surface of the foot consistent with metatarsalgia. There was no Morton's neuroma. His spine examination reveals normal cervical lordosis, normal thoracic kyphosis, and normal lumbar lordosis with paraspinal spasm. He did have a myofacial nodule on the right lower lumbar area that reproduced his pain in the right lower extremity. Crossed straight leg and straight leg raising were negative. Neurological examination reveals that he is oriented times three. Cranial nerves II-XII are grossly intact. Motor function is 5/5 in the upper extremities and 5/5 in the lower extremities. Reflexes were symmetrical throughout with downgoing plantar reflexes. Negative clonus and negative Hoffmann's. Sensation and coordination were within normal limits.

AR 188. Dr. Riutta's impression was as follows:

Mechanical low back pain most likely related to abnormal mechanics after his prior surgery – He does show evidence of degenerative disc disease at the L5-S1 level. He will be referred to physical therapy for lumbar traction, back stabilization exercises, and lower extremity strengthening. He may have persistence of symptomatology until his buttock pain diminished. In order to provide dedicated anti-inflamation, we will initiate him on a steroid taper to help maximize his anti-inflamation.

*Id*.

On June 24, 2008, Plaintiff complained to Dr. Wasvary of "sharp anal pain" since his procedure on June 9, 2008. AR 161.

On June 30, 2008, Dr. Jon Hain performed an andorectal ultrasound on Plaintiff, under anesthesia, due to complaints of chronic rectal pain. AR 167-168. Following the procedure, Dr. Hain concluded:

> In summary, the patient has a normal endoscopic ultrasound of the anus with obvious right lateral internal sphincterotomy but no evidence of infection or something that would cause chronic pain or discomfort.

AR 168. Thus, at this point in time, Dr. Hain concluded that Plaintiff's condition was normal.

On August 7, 2008, Dr. Gilbert wrote that Plaintiff "needs a different job that he will not sit for more than 15 minutes," and that he "needs one month off work for therapy." AR 150. Significantly, no test results or explanatory medical documentation of any kind accompany Dr. Gilbert's August 7, 2008, notes.

### D.

Plaintiff completed his application for LTD benefits on February 28, 2008. AR 224. In his application, Plaintiff identified three doctors with whom he has treated – Dr. Sacksner, Dr. Gilbert, and Dr. Kakish.[4] In support of Plaintiff's application, Dr. Gilbert, submitted an "Attending Physician Statement" dated February 29, 2008. AR 205-207. In his statement, Dr. Gilbert wrote that Plaintiff suffers from lower back pain and lumbar radiculopathy and that objective findings—namely, EMG and MRI—supported these diagnoses. Dr. Gilbert further indicated that Plaintiff can sit, stand, and walk for only one hour intermittently, but that Plaintiff's condition was expected to improve within two to three months. Dr. Gilbert recommended that Plaintiff treat his

---

[4] The administrative record contains no medical documents from Dr. Kakish.

symptoms with physical therapy and medication.  AR 205-206.

On April 29, 2008, MetLife sent a letter to Plaintiff confirming that it had received his claim for LTD benefits, stating that it had been unsuccessful in its attempts to reach Plaintiff by phone, and asking Plaintiff to contact a MetLife representative.  AR 198.

On May 14, 2008, MetLife requested medical records from Drs. Sacksner, Gilbert, and Wasvary.  AR 195-197.  MetLife states in its brief that the three doctors did not respond to its request; nothing evidencing a response to MetLife's May 14, 2008, request is found in the administrative record.

On June 11, 2008, Plaintiff faxed to GMAC "Discharge Instructions" from Beaumont Hospital dated June 9, 2008.  AR 192-194.  GMAC forwarded this document to MetLife.

On June 13, 2008, MetLife sent Plaintiff a letter denying his claim for LTD benefits. Obviously, documents dated after June 13, 2008, were not yet in existence.  The denial letter states, in part:

> Based upon a thorough review medical [sic] information contained in your claim file, we have determined that you do not qualify for long term disability benefits.
>
> * * * *
>
> Information received indicates you have a history of back pain and surgery for a [sic] anal fissure on August 31, 2007.  Information received indicates that you were released to return to work on February 29, 2008.  In our phone conversation on May 14, 2008, you stated that you had not returned to work and are still having problems with your back and may have injections.  You also stated you may need additional surgery for your anal fissure.
>
> We have made multiple attempts to obtain this information from your physicians but as of June 13, 2008, the requested information has not been received.  We have made multiple attempts to contact you by phone to review your claim, but have not received any return calls.

> The information received and reviewed indicates you have been released to return to work and no additional information has been received for review. For further consideration, you would need to provide office visit notes, medical records and testing that document your functional inability to perform sedentary work duties. If additional information becomes available it will be reviewed.

AR 190-191. The letter also explains the appeal procedure should Plaintiff seek further review of his claim. AR 191.

## E.

On July 3, 2008, MetLife received further medical documentation regarding Plaintiff's condition, AR 176-189: (1) the Physical Therapist's April 23, 2008, notes; (2) the Physical Therapist's handwritten note dated May 22, 2008; and (3) Dr. Riutta's office notes dated June 20, 2008. Each of these documents is discussed above.

On July 10, 2008, MetLife wrote to Plaintiff, AR 175, advising him that it needed "additional information from [his] physician" in order to consider his claim. MetLife also wrote in the letter that it had tried, unsuccessfully, to reach Plaintiff's physician by phone, and requested that Plaintiff ask his physician to forward pertinent medical documents to MetLife:

> We have attempted to reach your physician by telephone to discuss your claim. However, our attempts have been unsuccessful. Please have your physician call us, no later than July 24, 2008, to provide us with the following information:
>
> 1.    Your doctor's findings on exam
>
> 2.    Prescribed treatment plan, such as:
>         –frequency of treatment-doctor visits, therapy visits, referrals to
>          specialists
>         -current medications
>         -any test results
>
> 3.    Why you cannot perform the duties of your job (functional abilities)?

4. Expected return to work date

*Id.* The letter also warned that if MetLife does "not receive a call from [Plaintiff's] physician by July 24, 2008, [it] will make [a] decision based on the information already contained in [Plaintiff's] file." *Id.*

On July 11, 2008, MetLife received medical records from Dr. Wasvary and from Dr. Gilbert. The records received from Dr. Wasvary are found at AR 158-171, and the records from Dr. Gilbert are found at AR 172-174. The documents provided by Dr. Gilbert do not say anything of substance. The records provided by Dr. Wasvary include handwritten notes from office visits, discussed above, and the results of examinations performed on June 9, 2008, and June 30, 2008, also discussed above.

On August 20, 2008, Plaintiff wrote to GMAC with regard to his termination. AR 148. The termination letter referenced by Plaintiff is not in the record, and the record is unclear as to when and why Plaintiff was terminated. In his letter, Plaintiff wrote that he was "confused" as to why he was terminated in light of the August 7, 2008, notes written by Dr. Gilbert, discussed above, stating that Plaintiff's needs a job with limited sitting and one month off for physical therapy. In his letter, Plaintiff acknowledged:

> At present, I believe I could do some very limited work in between my prescription regimen (Vicadin, Neurotin, Tramadol & Motrin 800). But I could still negotiate over the phone and I could use a laptop to review the log notes. However, I am limited driving long distances to work, and would need to be in a private area since I have a problem with being able to control my bowels at times and with releasing gas.

AR 148.

Also on August 20, 2008, Plaintiff wrote a separate letter to MetLife appealing the purported July 10, 2008, decision of MetLife to deny, for a second time, Plaintiff's application for LTD benefits. AR 147. The administrative record does not contain MetLife's July 10, 2008, denial letter.

12

On August 27, 2008, MetLife wrote to Plaintiff acknowledging receipt of Plaintiff's August 20, 2008, appeal letter, and advising that it would make a determination within 45 days. AR 146.

MetLife referred Plaintiff's claim to two independent physician consultants, Dr. Dennis Gordon, Board Certified in Physical Medicine and Rehabilitation and in Internal Medicine, and Dr. Marc Sloan, Diplomat, American Board of Pain Medicine; Diplomat, American Board of Anesthesia. Both doctors reviewed Plaintiff's file but did not physically examine him. Dr. Sloan's report is found at AR 124-127. Dr. Gordon's report is found at AR 116-121. The reports of both doctors, especially Dr. Gordon, are thorough; both doctors acknowledge and discuss, in detail, Plaintiff's full medical history beginning with his August 2007 surgery, and the findings of doctors who had treated and examined him. AR 124-126 (Sloan); AR 116-120 (Gordon).

In addition, both Dr. Sloan and Dr. Gordon attempted to speak with Dr. Gilbert, via telephone. Dr. Sloan called Dr. Gilbert on September 9, 2008, to discuss Plaintiff's condition. AR 126. Dr. Gilbert refused to talk to Dr. Sloan until his identity was confirmed by MetLife. Dr. Sloan also called Dr. Riutta, but his number had been disconnected. *Id*.

On September 5, 2008, Dr. Gordon called Dr. Gilbert, who refused to talk to him unless Plaintiff signed a release form. AR 120-121. Dr. Gordon advised that he had no such form and did not have time to get one, given the time constraints on completing review. Dr. Gordon then called an appeals specialist at MetLife, who stated that review of Plaintiff's claim would be completed without discussion from Dr. Gilbert in view of time constraints.

Dr. Gordon called Dr. Riutta, as well:

> [Dr. Riutta] said his only contact with the [claimant] was 6/20/08, and on that date he saw no indication of radiculopathy. He felt the disk herniation on MRI was not compatible with radiculopathy. He felt he had no basis to feel that the claimant had a disability and therefore had not addressed that

question in his report. He had suggested further workup, but in view of the lack of follow-up, could make no statement supportive of any particular impairments.

AR 120.

Having examined Plaintiff's entire medical record, Dr. Sloan answered a question posed by

MetLife as follows:

> 1. Does the medical information support functional limitations (physical or psychiatric) beyond 8/31/2007?
>
> The medical documents reviewed do not support any functional limitations beyond 8/31/2007 with regards to the practice of pain medicine.
>
> Claimant does have a history of low back pain. Claimant was evaluated and had physical therapy. No further notes from physical therapy were available for review.
>
> Claimant appears to have received an epidural injection on 08/01/2008; however, no supporting documents were available for review.
>
> Therefore, it is my conclusion that the patient may have subjective complaints; however, there is no medical documentation supporting these complaints. Additionally, reports of diagnostic tests, EMG and lumbar MRI were not available for review.

AR 126. Dr. Gordon answered the same question as follows:

> Answer: The anal sphincterectomy or sphincterotomy on 8/31/07 would entail a convalescent period of three to four weeks. There is no information in the interval from that date through 12/12/07 (except for an updated part of an FMLA form), and no direct clinical information until 4/9/08. None of the secondary information from 12/12/07 and later, or the direct clinical information from 4/9/08 and onward supports functional limitations after the convalescence following the 8/31/07 operation, except for the days on which the claimant underwent rectal ultrasound and examination under anesthesia. The claim of radiculopathy is unsupported by the documentation, and Dr. Gilbert refused to provide input that might have changed this opinion. Dr. Riutta did not feel there was any radiculopathy. No cause except, possibly, myofascial pain has been suggested as the claimant's problem. There is nothing clear about the shoulder, neck or foot pain, and there is no clear significance to the degenerative disc disease.

AR 117.

On September 24 and 25, 2008, MetLife forwarded the reports of Drs. Sloan and Gordon to

Drs. Gilbert and Riutta, respectively, asking both to

> submit [his] comments on these reports, specifically addressing but not
> limited to, [Plaintiff's] impairments, restrictions and/or limitations. If you
> are not in agreement with this report, please submit clinical evidence in
> support of your conclusions.

AR 111, 122. Significantly, neither Dr. Gilbert nor Dr. Riutta responded to MetLife's request for

comments.

On October 7, 2008, MetLife advised Plaintiff, via letter, that its decision to deny his claim

for LTD benefits was upheld on appeal.[5] The letter, which is found at AR 102-105, recounted

Plaintiff's medical record/history beginning with his August 30, 2007, surgery:

> The documentation indicates that there are no records from the initial
> surgery, a right lateral sphincterotomy, apparently done on August 31, 2007.
> An undated Family Medical Leave (FMLA) form indicates that you were off
> work for an extended period after surgery.
>
> There is no information about why your recovery was prolonged. The
> FMLA form's expected to return to work date was October 20, 2007, but as
> of December 12, 2007, your surgeons felt that you could return to work
> without restriction on February 15, 2008. On February 15, 2008, Dr. Neil
> Gilbert, a neurologist, issued an out of work note for two additional weeks.
> Two weeks later Dr. Gilbert issued another out of work note for six
> additional weeks indicating that additional time was needed off work for low
> back pain and radiculopathy.
>
> The documentation indicates that the only clinical medical information is an
> Attending Physician's Statement dated February 29, 2008, in which Dr.

---

[5] The fact that MetLife denied Plaintiff's claim for LTD benefits twice before (without
the benefit of all the pertinent medical documentation) is irrelevant. The benefits determination
reviewed by this Court is the final determination made on October 7, 2008. At the time of the
final determination, MetLife's file presumably included all the medical documentation contained
in the administrative record – the same records that are before the Court.

Gilbert noted that you had undergone an EMG and MRI for low back and leg pain. Dr. Gilbert indicates that the EMG and MRI studies supported lumbar radiculopathy, but offered no physical examination or functional finding, and he expected you to improve within two to three months physical therapy. Dr. Gilbert recommended a job where you had limited sitting.

On June 20, 2008 Dr. Justin Riutta noted you had complaints of numbness and burning in the buttocks, and into the right posterior thigh in the associated degeneration, but did not give the EMG results. You reported to Dr. Riutta complaints of symptoms in several other areas, including knee pain with prolonged sitting, aching in the shoulder and shoulder girdle, and pain in the balls of your feet, but no neurogenic changes below the knees or in the upper extremities were reported. Your examination was normal except for a "high riding" right shoulder with "abnormal scapulohumeral mechanics," but no weakness of the plantar tenderness was consistent with metartarsalgia; paraspinal spasm; and a lumbar myofascial trigger point that reproduced the right lower extremity pain. Dr. Riutta concluded that you had mechanical low back pain and polyarthralgias, and ordered physical therapy and a steroid taper.

On June 30, 2008 you underwent an endorectal ultrasound; it showed the expected residual of sphicterotomy. You were referred to pain management.

There is documentation of discharge papers on August 1, 2008, but no indication about the reasons for admission.

AR 102-103.

The letter further recounted the reports of Drs. Gordon and Sloan. As to Dr. Gordon, the letter states:

[Dr. Gordon] placed a telephone call to Dr. Gilbert on September 5, 2008. Dr. Gilbert wanted a guarantee from you that he was not in HIPPA violation if he spoke with [Dr. Gordon]. [Dr. Gordon] did not have a specific guarantee and was not able to complete the telephone conference.

[Dr. Gordon] called Dr. Riutta on September 5, 2008. Dr. Riutta stated that his only contact with you was on June 20, 2008, and on that date he saw no indication of radiculopathy. Dr. Riutta stated that the disc herniation on the MRI was not compatible with radiculopathy. Dr. Riutta felt he had no basis to feel that you had a disability and therefore had not addressed that question in his report.

He stated that he suggested further work up, but in view of the lack of follow-up, he could make no statement supportive of any particular problems.

[Dr. Gordon] opined that the anal sphincterectomy or sphincterotomy on August 31, 2007 would require a recovery period of three to four weeks ending on September 28, 2007. [Dr. Gordon] opined that there is no information in the interval from that date through December 12, 2007 (except for the updated part of an FMLA form), and no direct clinical information until April 9, 2008 that supports the need for functional limitations, except on the days in which you underwent rectal ultrasound and examination under anesthesia.

[Dr. Gordon] opined that the diagnosis of radiculopathy is unsupported by the documentation, and Dr. Gilbert was not able to provide additional input. [Dr. Gordon] opined that there is nothing clear about the shoulder, neck or foot pain, and there is no clear significance to the degenerative disc disease.

AR 103-104. As to Dr. Sloan, the letter states:

> [Dr. Sloan] placed a telephone call to Dr. Gilbert on September 9, 2008. Dr. Gilbert would not speak with [Dr. Sloan] without a specific release.

> [Dr. Sloan] placed a telephone call to Dr. Ruitta [sic] but was unable to make contact for a telephone conference.

> [Dr. Sloan] opined that the clinical medical documentation does not support any functional limitations beyond August 31, 2007 with regard to the practice of pain medicine.

> [Dr. Sloan] opined that you have a history of low back pain and you were evaluated and had physical therapy. There were no further progress notes from the physical therapy. You received an epidural on August 1, 2008, but there was no supporting documentation.

> [Dr. Sloan] opined that you have subjective complaints, however, there is no clinical medical documentation supporting your complaints. There are no reports of diagnostic tests, EMG and lumbar MRI to review.

AR 104. Having considered the medical documentation in Plaintiff's claim file and the opinions of

Drs. Gordon and Sloan, MetLife concluded:

> Based on our review of you entire file, we find that there is no clinical medical evidence to support that you had functional limitations continuously

through your elimination period August 31, 2007, and beyond your Long Term Disability benefit start date of February 27, 2008; that would preclude you from performing your own occupation, as such we find that the original decision to deny benefits was appropriate.

AR 104.

## F.

Plaintiff filed the present action on September 29, 2009, and the parties filed their cross-motions for judgment on June 17, 2010.

## B.  Conclusions of Law

## 1.  Standard of Review

As noted above, the denial of benefits in this case is reviewable by the Court under the arbitrary and capricious standard because the terms of the plan give the plan administrator and plan fiduciaries "discretionary authority" to interpret the terms of the plan and determine eligibility.  AR 42-43; *Bruch*, 489 U.S. at 115.  Both parties agree that the arbitrary and capricious standard is applicable.

The Court's duty under the arbitrary and capricious standard has been summarized by the Sixth Circuit:

> review under the arbitrary and capricious standard is extremely deferential and has been described as the least demanding form of judicial review. Under this deferential arbitrary and capricious standard, we will uphold a benefit determination if it is rational in light of the plan's provisions.  The arbitrary-and-capricious standard, however, does not require us merely to rubber stamp the administrator's decision.  Under the arbitrary-and-capricious standard, both the district court and this court must exercise review powers.

*Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 660-661 (6th Cir. 2004) (case citations, quotation marks, and brackets omitted).  *See also Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006)

("[w]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious" (quotation marks and citations omitted)).

However, the Sixth Circuit has "recognized that a conflict of interest exists when the insurer both decides whether the employee is eligible for benefits and pays those benefits." *Evans*, 434 F.3d at 876. In the present case, MetLife wears both hats, *see* AR 45 ("[a]s named fiduciaries, the Employer [GMAC] and Insurer [MetLife] have the authority to control and manage the operation and administration of the Plan"), thereby giving rise to a conflict of interest.

In the Sixth Circuit,

> this conflict of interest does not displace the arbitrary and capricious standard of review; rather, it is a factor that we consider when determining whether the administrator's decision to deny benefits was arbitrary and capricious. The reviewing court looks to see if there is evidence that the conflict in any way influenced the plan administrator's decision.

*Evans*, 434 F.3d at 876 (citations omitted).[6] "In considering such a conflict, there must be significant evidence in the record that the insurer was motivated by self-interest, and the plaintiff bears the burden to show that a significant conflict was present." *Smith v. Continental Cas. Co.*, 450 F.3d 253, 260 (6th Cir. 2006). In other words, there must be some evidence "to suggest that Defendant's decision [to deny benefits is] motivated or influenced by its financial interest in

---

[6] The Sixth Circuit has noted, but declined to follow, a different approach taken by other circuits:

> While several courts have altered the standard of review to something less deferential than the arbitrary and capricious standard where a benefits administrator is operating under a conflict of interest (*see e.g., Adams v. Thiokol Corp.*, 231 F.3d 837, 842 (11th Cir. 2000)), this Court has not taken that approach. Instead, as noted, the standard remains unchanged and the conflict of interest is to be considered in applying that standard.

*Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 293 (6th Cir. 2005).

minimizing Plan payouts, beyond the brute fact that Defendant does indeed have such a financial stake in benefit determinations." *Monks v. Keystone Powdered Metal Co.*, 78 F. Supp.2d 647, 664 (E.D. Mich. 2000). In the present case, Plaintiff has not demonstrated that MetLife's decision to deny benefits was in any way motivated by this conflict.[7]

### 2. The Parties' Arguments

#### a. MetLife's Position

MetLife argues that, notwithstanding subjective complaints of rectal and back pain, Plaintiff has failed to provide objective medical evidence establishing functional limitations that precluded him from performing his job duties during the Elimination Period (from August 31, 2007, to February 27, 2008), and beyond. MetLife contends that Plaintiff's entire medical record was thoroughly reviewed by two Board Certified physicians, both of whom concluded that no objective clinical evidence supported Plaintiff's claim of continuing disability precluding him from performing his sedentary job duties with GMAC.

#### b. Plaintiff's Position

Plaintiff, on the other hand, disagrees with MetLife's determination that he failed to provide objective evidence in support of his claim, and argues that MetLife's decision to deny his claim was arbitrary and capricious. Plaintiff asserts four main arguments in support of his position. First,

---

[7] In fact, neither Plaintiff nor MetLife even mention this particular conflict of interest in their motion papers. A different kind of conflict of interest is mentioned and discussed by Plaintiff in his papers (one relating specifically to the two independent physician consultants, Drs. Gordon and Sloan, discussed by the Court in more detail below), but Plaintiff does not mention the conflict stemming from MetLife's dual role as the decider and payer of plan benefits. Because Plaintiff has not mentioned this particular conflict, he has not attempted to establish that MetLife's decision to deny his claim for LTD benefits was motivated by the conflict.

Plaintiff argues that MetLife's decision to deny his claim for LTD benefits was arbitrary and capricious because MetLife failed to confirm issues surrounding Plaintiff's lower back problems with Dr. Gilbert before denying the claim:

> [W]hen Dr. Gilbert requested a HIPPA release, MetLife stated they did not have time to obtain [one]." [Admin. Rec. at 120-121]. Dr. Dennis S. Gordon explained in his medical review that speaking with Dr. Gilbert may have changed his opinion regarding objective medical information supporting Plaintiff's functional limitations. [Admin. Rec. at 129]. The opinion of Dr. Gordon, which Defendant relied on so heavily, could have been changed by obtaining a simple HIPPA release. However, Defendant chose not to obtain this release and then highlight this lack of information to Plaintiff's detriment.

Pl. Resp. at 4-5 (emphasis deleted).

Second, Plaintiff argues that MetLife's decision to deny his claim for LTD benefits was arbitrary and capricious because MetLife relied heavily on the opinions of Drs. Gordon and Sloan—both of whom were retained by MetLife and conducted a "pure paper" review of Plaintiff's medical history without conducting a physical examination—over the opinions of Plaintiff's treating physicians.

Third, Plaintiff believes that MetLife's decision to deny his claim for benefits was arbitrary and capricious because MetLife "cherry-picked" evidence, in violation of *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356 (6th Cir. 2002), by ignoring evidence that was favorable to Plaintiff while emphasizing evidence that was unfavorable to him.

Finally, Plaintiff contends that objective medical evidence supports his claim of continuing disability from August 30, 2007, through August 7, 2008, and beyond.[8]

_____

[8] Plaintiff states that he has had chronic rectal pain ever since his hemorrhoidectomy and sphincterotomy, which was performed on August 30, 2007. Plaintiff points out that although Dr. Sacksner wrote a note saying Plaintiff could return to work on February 15, 2008, Dr. Gilbert

### 3. Discussion

#### a.

Plaintiff argues that the decision to proceed with a final determination of his claim without Dr. Gilbert's input rendered MetLife's final determination arbitrary and capricious. Specifically, Plaintiff faults MetLife for not providing Dr. Gilbert with the requested HIPPA release, which would have allowed Dr. Gilbert to speak to MetLife regarding Plaintiff's medical situation. This argument lacks merit for several reasons. First, the plan expressly places the burden on the claimant—Plaintiff—to prove disability:

> In order to receive benefits under This Plan, you must provide to us at your expense, and subject to our satisfaction . . . [p]roof of Disability, evidence of continuing Disability, . . . [and] "[a]ny other material information related to your Disability which may be requested by us.

AR 15-16. It was not MetLife's responsibility, under the terms of the plan, to furnish a HIPPA release for Dr. Gilbert's signature. Rather, it was Plaintiff's responsibility to ensure that MetLife received appropriate medical documentation evidencing continuous disability.

In addition, the administrative record reflects that MetLife repeatedly sought Dr. Gilbert's input throughout the entire claim adjudication process. On May 14, 2008, MetLife requested

---

wrote  another note on February 29, 2008, saying that Plaintiff would need an additional six weeks off work due to lower back pain and lumbar radiculopathy.

Plaintiff further points out that Dr. Gilbert referred him to physical therapy for four weeks on April 11, 2008, and that the Physical Therapist found that Plaintiff had a functional capacity of 23%, along with range of motion deficits, and pain of 7 out of 10 on the McGill pain scale. Plaintiff emphasizes his June 20, 2008, visit with Dr. Riutta, who found evidence of "low back pain most likely related to abnormal mechanics after his prior surgery" and "degenerative disc disease at the L5-S1 level." Finally, Plaintiff highlights the fact that he was on FMLA leave from August 31, 2007, until March 28, 2008, and that Dr. Gilbert wrote a note on August 7, 2008, stating that Plaintiff needs a job that would not require him to sit for longer than 15 minutes.

medical records from Dr. Gilbert.  AR 197.  He did not respond.  On July 10, 2008, MetLife wrote

to Plaintiff requesting that he have his doctors submit certain medical documentation by July 24,

2008.  AR 175.  Dr. Gilbert responded to the request, but produced documents containing no

substantive medical information.  AR 172-174.  Additionally, both Dr. Sloan and Dr. Gordon

attempted to speak to Dr. Gilbert about Plaintiff's condition by telephone.  However, Dr. Gilbert

refused to speak to them, citing privacy concerns.  AR 114, 120-121.  Further, although MetLife was

under no legal obligation to do so, it afforded Dr. Gilbert the opportunity to submit comments

responsive to the reports of Drs. Sloan and Gordon before making its final benefits determination.

AR 111, 122.

> Permitting a claimant to receive and rebut medical opinion reports generated
> in the course of an administrative appeal-even when those reports contain no
> new factual information and deny benefits on the same basis as the initial
> decision-would set up an unnecessary cycle of submission, review,
> re-submission, and re-review. This would undoubtedly prolong the appeal
> process, which, under the regulations, should normally be completed within
> 45 days.

*Metzger v. UNUM Life Ins. Co. of Am.*, 476 F.3d 1161, 1166 (10th Cir. 2007).  The efforts made by

MetLife support its argument that it acted reasonably in denying Plaintiff's claim for benefits despite

the absence of Dr. Gilbert's added input, which it actively sought on several occasions.  MetLife did

have Dr. Gilbert's medical records, and provided them to its medical consultants.

### b.

Second, Plaintiff contends that the Court should reverse MetLife's benefits determination

based on MetLife's reliance on the opinions of two independent physician consultants, Drs. Gordon

and Sloan.  Plaintiff advances two separate arguments as to why MetLife's reliance on the opinions

of Drs. Sloan and Gordon rendered its benefits determination arbitrary and capricious.

First, relying on *Moon v. UNUM Provident Corp.*, 405 F.3d 373 (6th Cir. 2005), and *Kalish*

*v. Liberty Mutual/Liberty Life Assurance Co. of Boston*, 419 F3d 501 (6th Cir. 2005), Plaintiff

argues that the two independent physician consultants were operating under conflicts of interest,

rendering their findings unreliable, because Drs. Sloan and Gordon were paid by MetLife to conduct

their respective reviews of Plaintiff's medical record. In *Moon*, a case involving an insurance

company's decision to deny LTD benefits to a claimant, the insurance company's own "in-house

reviewing physician," Dr. Feagin, "seized upon" a single test result and interpreted it out-of-context

in recommending a finding of "not disabled" under the terms of plan. 405 F.3d at 375, 382. As

characterized by the court, Dr. Feagin's role "was not as a neutral independent reviewer, but as an

employee of [the insurance company]." *Id*. at 381. Noting that "when a plan administrator's

explanation is based on the work of a doctor in its employ, [courts] must view the explanation with

some skepticism," *id*. at 381-382, the Sixth Circuit reversed the trial court's determination that the

insurance company's denial of LTD benefits was not arbitrary and capricious. *Id*. at 382.

*Kalish* is another case upon which Plaintiff relies involving the denial of LTD benefits based

on the opinion of a non-treating physician. However, unlike *Moon* where the non-treating physician

was an "in-house reviewing physician" of the insurance company, the non-treating physician in

*Kalish*, Dr. Conrad, was "an independent expert retained by [the insurance company] to conduct a

peer review of the work of [the claimant's] treating cardiologist." 419 F.3d at 507. In addressing

the claimant's argument that there was a conflict of interest when the insurance company relied upon

the recommendation of a retained independent expert, the Sixth Circuit wrote:

> Kalish makes the legally valid point that, "when a plan administrator's
> explanation is based on the work of a doctor in its employ, we must view the
> explanation with some skepticism." *Moon v. Unum Provident Corp.*, 405
> F.3d 373, 381-82 (6th Cir.2005). But Dr. Conrad was not an employee of

24

[the insurance company]. Rather, he was an independent expert retained by [the insurance company] to conduct a peer review of the work of Kalish's treating cardiologist, Dr. Rasak, and to examine the other medical records in Kalish's file. There is no evidence that [the insurance company] attempted to tamper with or inappropriately influence Dr. Conrad's evaluation, which could lead us to conclude that [the insurance company] had acted arbitrarily and capriciously in relying upon his opinion. *See* [*McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 168 (6th Cir. 2003)] (finding a denial of benefits to be arbitrary and capricious when premised on the report of an independent doctor whose initial opinion changed after "a telephone call from members of [the plan administrator]'s appeals committee").

Even so, the Supreme Court has acknowledged "that physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers['] money and preserve their own consulting arrangements." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) (citation and quotation marks omitted). This court has similarly observed that a plan administrator, in choosing the independent experts who are paid to assess a claim, is operating under a conflict of interest that provides it with a "clear incentive to contract with individuals who were inclined to find in its favor that [a claimant] was not entitled to continued [disability] benefits." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292 (6th Cir. 2005) (noting that the "possible conflict of interest inherent in this situation should be taken into account as a factor in determining whether [a plan administrator's] decision was arbitrary and capricious") (quotation marks omitted). Thus, although "routine deference to the opinion of a claimant's treating physician" is not warranted, we may consider whether "a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled' " as a factor in determining whether the plan administrator acted arbitrarily and capriciously in deciding to credit the opinion of its paid, consulting physician. *See Nord*, 538 U.S. at 832, 123 S.Ct. 1965.

In the present case, however, Kalish has offered only conclusory allegations of bias with regard to Dr. Conrad. He failed to present any statistical evidence to suggest that, when retained by [the insurance company], Dr. Conrad has consistently opined that claimants are not disabled. *See id.* (stating that a determination of bias "might be aided by empirical investigation"); *see also Calvert*, 409 F.3d at 293 n.2 ("The Court would have a better feel for the weight to accord this conflict of interest if [the claimant] had explored the issue through discovery. While . . . discovery is . . . [ordinarily not] permissible in an ERISA action premised on a review of the administrative record, an exception to that rule exists where a plaintiff

seeks to pursue a decision-maker's bias."). In the absence of such evidence, we are unable to conclude on this basis that [the insurance company] acted arbitrarily and capriciously in deciding to credit the opinion of Dr. Conrad over that of Dr. Rasak. *See Nord*, 538 U.S. at 832, 123 S.Ct. 1965 (noting that "a treating physician, in a close case, may favor a finding of 'disabled'").

419 F.3d at 507-508.

Because Drs. Sloan and Gordon are independent physician consultants retained by MetLife, and not "in-house reviewing physicians," the analysis employed by the *Kalish* court is controlling. Under *Kalish*, the Court looks for "evidence that [the insurance company] attempted to tamper with or inappropriately influence [the independent physician's] evaluation." *Kalish*, 419 F.3d at 507. In the present case, Plaintiff does not allege any facts suggesting that the evaluations of Drs. Sloan and Gordon were tainted by MetLife's bias. Nor does Plaintiff set forth any specific facts, such as statistical data, suggesting that Drs. Sloan and Gordon consistently find claimants "not disabled" in order to appease MetLife or preserve their consulting agreements. In the absence of such evidence, Plaintiff cannot show that MetLife acted arbitrarily and capriciously by denying his claim for LTD benefits based on the evaluations of two Board Certified independent physician consultants.

Second, Plaintiff also argues that the opinions of Drs. Sloan and Gordon should be discounted because they conducted a "pure file review" of Plaintiff as opposed to an in-person physical examination. The Sixth Circuit addressed this issue in *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286 (6th Cir. 2003), a case on which Plaintiff relies. There, the Sixth Circuit wrote:

we regard [the insurance company's] decision to conduct a file review rather than a physical exam as just one more factor to consider in our overall assessment of whether [the insurance company] acted in an arbitrary and capricious fashion. Thus, while we find that [the insurance company's] reliance on a file review does not, standing alone, require the conclusion that [it] acted improperly, we find that the failure to conduct a physical examination-especially where the right to do so is specifically reserved in the plan-may, in some cases, raise questions about the thoroughness and

26

accuracy of the benefits determination.

*Id*. at 295.  Phrased differently, the Sixth Circuit held that there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination" so long as the file review is adequate.  *Id*. at 296.  In *Calvert*, the court found that the insurance company acted arbitrarily and capriciously by basing its benefits determination on a "clearly inadequate" file review conducted by an independent physician consultant, Dr. Soriano.  As explained by the court, Dr. Soriano's file review was "clearly inadequate" because he (1) "did not describe [in his report] the data he reviewed in reaching his conclusion," (2) ignored test results that were favorable to the claimant, such as x-rays and CT scans, which were contained in the record, thereby casting doubt as to whether he was even aware that these objective tests had been performed, and (3) reached "incredible" conclusions that "d[id] not square with the verifiable objective results of [the claimant's] x-rays and CT scans."  *Id*. at 296.

*Calvert* and the present case are clearly distinguishable because the evaluations of Drs. Sloan and Gordon, although based on a file review and not a physical examination of Plaintiff, are more than adequate.  As discussed above, both doctors carefully and thoroughly recited and addressed Plaintiff's full medical history in their respective reports, and specifically noted those medical facts and opinions that are favorable to Plaintiff.  As discussed more in part (d) of this subsection, below, the doctors neither ignored medical facts in the record nor reached "incredible" conclusions that do not "square with" the opinions of Plaintiff's treating physicians.  Notably, "[r]eliance on [non-treating] physicians is reasonable so long as the administrator does not totally ignore the treating physician's opinions."  *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 504 (6th Cir. 2010).  Accordingly, MetLife's decision to order its independent physician consultants to conduct

a file review over a physical examination does not render MetLife's final benefits determination arbitrary and capricious under the circumstances here.

### c.

Next, Plaintiff argues that MetLife "cherry-picked" evidence by "ignor[ing] evidence that was favorable to Plaintiff and highlight[ing] the evidence that was favorable to [MetLife]." In support of his argument, Plaintiff relies upon the Sixth Circuit's decision in *Spangler*. There, the Sixth Circuit found that the insurance company's decision to deny a claimant's claim for LTD benefits was arbitrary and capricious where the decision was based on the report of a vocational consultant, whose opinion was based entirely on an "aberrant" report of an attending physician, which the insurance company had "'cherry-picked' [from the claimant's file] . . . in hopes of obtaining a favorable report from the vocational consultant as to [the claimant's] ability to work." *Id*. at 362.

The present case is not comparable to *Spangler*; MetLife's decision to deny Plaintiff's claim in the present case was based, in part, on the reports of two independent physician consultants, both of whom were furnished with *all* pertinent medical information about Plaintiff as opposed to only a single "cherry-picked," "aberrant" medical document. Moreover, Plaintiff does not state specifically what evidence he believes was ignored or over-emphasized by MetLife. There was simply no "cherry-picking" by MetLife in this case; rather, all evidence—including that which is favorable to Plaintiff—was considered and discussed by MetLife and, specifically, by Drs. Gordon and Sloan.

### d.

Finally, Plaintiff argues that he submitted sufficient objective/clinical medical evidence in

support of his claim, rendering MetLife's denial of his claim for lack of such evidence arbitrary and capricious. Upon review of the entire administrative record in this case, however, the Court finds that the administrative record contains ample evidence supporting MetLife's decision to deny Plaintiff's claim for LTD benefits.

In order to receive LTD benefits under the plan, Plaintiff must have been continually "disabled" throughout the entire 180-day Elimination Period (from August 31, 2007, until February 27, 2008), and beyond. "Disabled," under the terms of the plan, means that Plaintiff is "unable to earn more than 80% of your Predisability Earnings." AR 20. Moreover, the terms of the plan place the burden on Plaintiff to provide proof of continuing disability:

> In order to receive benefits under This Plan, you must provide to us at your expense, and subject to our satisfaction, all of he following documents . . .
>
> ✓      Proof of Disability.
>
> ✓      Evidence of continuing Disability.
>
> ✓      Proof that you are under the Appropriate Care and Treatment of a Doctor throughout your Disability.
>
> ✓      Information about Other Income Benefits.
>
> ✓      Any other material information related to your Disability which may be requested by us.

AR 15-16.

The evidence contained in the administrative record reflects that Plaintiff underwent a hemorrhoidectomy and sphincterotomy on August 31, 2007. According to Dr. Gordon, this procedure would require a convalescent period of three to four weeks. However, as noted by Dr. Gordon in his report, the record contains no objective/clinical evidence as to why Plaintiff could not return to work in late September or early October, after the three to four week convalescent period.

*See Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 166 (6th Cir. 2007) ("[r]equiring a claimant to provide objective medical evidence of disability is not irrational or unreasonable"). For this reason alone, the Court cannot conclude that MetLife's decision to deny Plaintiff's claim was arbitrary and capricious, as Plaintiff had not proven continuing disability throughout the Elimination Period.

In addition, the Court notes that on December 12, 2007, long after the expiration of the three to four week convalescent period, the doctor who performed Plaintiff's hemorrhoidectomy and sphincterotomy, Dr. Sacksner, indicated that Plaintiff could return to work with no restrictions on February 15, 2008, a date that is within the Elimination Period. AR 230. On February 15, 2008, however, Dr. Gilbert wrote that Plaintiff needed an additional two weeks off work due to back pain, AR 227, and on February 29, 2008, wrote that Plaintiff needed six more weeks off for management of his back pain and radiculopathy. AR 226. However, as noted by Dr. Gordon, Dr. Gilbert never provided the results of any objective medical tests in support of his determination that Plaintiff could not work effective February 15, 2008, due to radiculopathy. Moreover, it is important to note that one of Plaintiff's treating physicians, Dr. Riutta, "did not feel there was any radiculopathy." AR 117. According to Dr. Gordon, who spoke with Dr. Riutta by telephone on September 5, 2008:

> [Dr. Riutta] saw no indication of radiculopathy. He felt the disk herniation on MRI was not compatible with radiculopathy. He felt he had no basis to feel that the claimant had a disability and therefore had not addressed that question in his report. He had suggested further workup, but in view of the lack of follow-up, could make no statement supportive of any particular impairments.

AR 120. MetLife was not obligated to accord controlling weight to the opinion of Dr. Gilbert, which was unsupported by any objective/clinical medical evidence. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003) (holding that "plan administrators are not obligated to accord special deference to the opinions of treating physicians," nor are they obligated "to credit the

opinions of treating physicians over other evidence relevant to the claimant's medical condition").

Additionally, Dr. Wasvary conducted an examination of Plaintiff under anesthesia on June 9, 2008. AR 169. Dr. Wasvary concluded that (1) the "examination was completely normal," (2) there was "no obvious etiology to [Plaintiff's] pain," and "chose not to proceed any further." Dr. Hain's examination of Plaintiff on June 30, 2008, also revealed "no evidence of infection or something that would cause chronic pain or discomfort." AR 168.

In sum, one of Plaintiff's treating physicians, Dr. Gilbert, determined there to be radiculopathy, preventing Plaintiff from working, while another one of Plaintiff's treating physicians, Dr. Riutta, "did not feel there was any radiculopathy." Thus, Plaintiff's own treating physicians were not even in agreement regarding a diagnosis that would prevent Plaintiff from working. Moreover, Drs. Wasvary and Hain both examined Plaintiff and found, essentially, no evidence that would support Plaintiff's complaints of chronic rectal pain. It is true that Dr. Gilbert wrote that Plaintiff needed a job with limited sitting, a fact that Plaintiff emphasizes in his brief and that both Dr. Sloan and Dr. Gordon acknowledge in their respective reports. However, as Dr. Gordon noted in his report, Dr. Riutta's opinion was not in accord, and Dr. Gilbert provided no clinical/objective evidence in support of his finding, despite repeated requests by MetLife. Under these circumstances, and in light of the conflicting evidence among even Plaintiff's treating physicians, MetLife's decision to deny Plaintiff's claim for LTD benefits was rational and not arbitrary and capricious.

## IV. CONCLUSION AND ORDER

For the reasons stated, MetLife's decision to deny Plaintiff's claim for LTD benefits survives scrutiny under the arbitrary and capricious standard because its explanation was reasoned based on

the evidence before it.  Therefore, MetLife's Motion to Affirm the Plan Administrator's Decision

is granted and Plaintiff's Motion to Reverse the Plan Administrator's Determination is denied.

Judgment is entered in favor of MetLife; this case is dismissed.

      SO ORDERED.


                S/Paul D. Borman
                PAUL D. BORMAN
                UNITED STATES DISTRICT JUDGE

Dated:  August 30, 2010

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on August 30, 2010.


                S/Denise Goodine
                Case Manager